#### IN THE

# SUPREME COURT OF JUDICATURE

#### OF THE

## STATE OF NEW-YORK.

IN JANUARY TERM, 1812, IN THE THIRTY-SIXTH YEAR OF OUR IN-
DEPENDENCE.

---

### CLARKSON AND OTHERS *against* THE PHŒNIX INSURANCE COMPANY.

THIS was an action on two policies of insurance on goods la-
den on board the ship *Governor Gore, Waddle,* master, on a
voyage from *New-York* to *Tonningen;* " warranted *American*
property, proof to be required here only ; also, not to abandon, if
captured, until six months after notice, unless previously con-
demned, nor if refused admittance or turned away, but may pro-
ceed to another near open port."

<div style="float:right">Policy of in-
surance on
goods from
*New-York* to
*Tonningen,*
" warranted
not to aban-
don if detain-
ed or captur-
ed, until six
months after
notice, unless
previously
condemned, nor if refused admittance or turned away, but may proceed to another near open port."</div>

During the voyage, the vessel was boarded by *British* cruisers, who, after examining her pa-
pers, allowed her to proceed. She was afterwards captured, on the 31st *March,* by a *French* pri-
vateer and carried into *Calais.* The vessel and cargo were libelled in the council of prizes at
*Paris.* The master was advised by counsel, by the *American* consul-general and agent of prizes,
and by the *American minister,* that the property would certainly be condemned, under the *Berlin*
and *Milan* decrees, and that he ought to attempt a compromise with the captors. The master
made a compromise, and on being paid about one fourth of the value of the vessel and cargo, he
abandoned them to the captors.

The insured received advice of the capture on the 26th *May,* and gave immediate notice thereof
to the insurers, and on the 26th *November,* made an abandonment for a total loss.

The compromise was made on the 26th *July,* by the master, who was part owner of the ship,
and he acted *bona fide,* and for the benefit of all concerned, but without any express authority,
and his acts were not adopted or ratified by the insured. It was held, that the master was, from
necessity, the agent of both parties, and his acts could not prejudice either ; that the capture crea-
ted a valid cause of abandonment ; that the written clause merely suspended the exercise of the
right for six months, or until a condemnation, and, at the expiration of that time, the abandon-
ment being duly made, had relation back to, and took effect from, the capture, as a technical total
loss.

VOL. IX.                                    A

At the trial, the interest of the plaintiffs was admitted, and that the ship and goods were *American*, and duly documented.    The ship sailed on the voyage the 21st *February*, 1810.    On the 24th *March* she was met by a *British* cruiser, who examined her papers and permitted her to proceed ; and was again met by another *British* cruiser, on the 31st *March*, who permitted her to proceed, after examining her papers.    She was, afterwards, on the 31st *March*, captured by a *French* privateer and carried into *Calais*. The ship and cargo were libelled in the imperial council of prizes at *Paris*, under the *Berlin* and *Milan* decrees, and the captors demanded a condemnation ; 1. Because, since those decrees, the ship had made a voyage to *England ;* 2. Because she had submitted to two visits from *English* vessels of war; 3. Because the certificates of origin on board were irregular.    The captain caused a claim to be put in, by the *American* consul-general and agent of prizes at *Paris*, in behalf of the owners.    The counsel consulted by the master, were of opinion that the ship and cargo would certainly be condemned, under the *Berlin* and *Milan* decrees ; and the *American* consul-general, by letter, and afterwards, personally, advised the captain to make a compromise with the captors, as, in his opinion, the property would certainly be condemned.    The same opinion and advice were also given to the master, by the *American minister* at *Paris*.    The *American* consul, at *Calais*, also advised the captain to compromise with the captors, and save as much as he could.    The master being thus advised by all the persons he consulted, that the property must inevitably be condemned, and that he ought to attempt a compromise, made overtures to the captors for that purpose ; and to induce them to favourable terms, he represented to them that he would prove that the capture was made by the privateer, while under *British* colours, contrary to the laws of *France*, in consequence of which the proceeds of the prize would be taken wholly by the government.    A written agreement was made, on the 25th *July*, 1810, between the master and the captors, by which the latter stipulated to pay 50,000 francs, provided it should be ratified by the council of prizes, and to be paid out of the proceeds of the sales of the ship and cargo, and the master ceded and abandoned them to the captors.    By a private agreement with the captain, the captors were to pay 14,000 francs more.    The public contract having been ratified by the council of prizes, both sums were paid to the master.    The plaintiffs and defendants both refused to receive the money, which amounted to about 25

ALBANY,
Jan. 1812.

CLARKSON
v.
PHOENIX
INS. Co.

*per cent.* on the ship and cargo; and the same remained ready to be paid to whoever should be entitled to receive it. In making this compromise, the master acted entirely with the knowledge and advice of the *American* consul-general and agent of prizes; and of the *American* minister, the former of whom signed the contracts with the captors. The plaintiffs had no agent or consignee at *Calais;* and the goods were not consigned to the master, nor had he any other authority, in relation to them, than what resulted from his being master of the ship.

It was admitted that the master, who was owner of one fourth of the ship, acted throughout in good faith, and in a manner which he believed to be for the interest of all concerned, and without knowledge of any insurance having been made.

Advice of the capture was received by the plaintiffs, on the 26th *May*, 1810, and on the same day they gave notice thereof to the defendants, and on the 26th *November* made an abandonment to them of the property. The defendants refused to accept the abandonment, supposing themselves discharged by the act of the master in ceding the property to the captors, before the plaintiffs had a right to abandon.

A verdict was found for the plaintiffs, subject to the opinion of the court on a case containing the above facts. It was agreed, that if the court should be of opinion that the plaintiffs were entitled to recover, the amount should be liquidated by two persons to be appointed by the court; and that either party might turn the case into a special verdict.

*P. A. Jay*, for the plaintiffs. A master acting *bona fide*, for the interest of all concerned, cannot, by his acts, vacate the policy. In the case of *Junel & Desobry* v. *The Marine Insurance Company*,* a compromise made by the master, after an abandonment, did not affect the right of the insured to recover for a total loss. The question now is, whether such a compromise, made before an abandonment, can alter or prejudice the rights of the insured. It is for the interest of all parties that the master should have the power to act for the benefit of all concerned. At the time of the capture, the master was, by law, the agent of both parties, and a joint agent cannot, by his acts, change the relation of his principals, or vary their rights.

Again, by the capture, the right of abandonment became vested, and must continue, until devested by a restoration of the property, or by some act of the insured, or their authorized agent. It

* 7 *Johns.*
*Rep.* 412.

ALBANY,
Jan. 1812.

CLARKSON
v.
PHOENIX
INS. Co.

* 2 Caines,
301. 1 Wm.
Bl. 313.
† ⸗ Term
Rep. 608. and
note. Planta-
mour v. Sta-
ples. Mills v.
Fletcher,
Doug. 231.

cannot be pretended, in this case, that the plaintiffs had any control over the master, who was necessarily as much the agent of the defendants as of the plaintiffs.* It is admitted that he acted in good faith. Will it be said that he acted ignorantly or foolishly? It is enough that he acted according to his best judgment, and the best advice which could be obtained.† Can it be said that, under the circumstances of the case, he did not act well?

It may be said, that the plaintiffs could make no abandonment; because, having parted with all their property, they had nothing to abandon. If so, then an act of abandonment was equally unnecessary as if the vessel had been wholly lost at sea. But an abandonment relates back to the time of capture. The clause in the policy merely suspends the exercise of the right of abandonment for six months.

It will, perhaps, be said, that the defendants have, by the compromise with the captors, been deprived of their right to claim compensation from the *French* government; but as the compromise was ratified by the council of prizes, any claim against the government must remain unimpaired.

*Hoffman* and *T. A. Emmet*, contra. This is the first of a new class of cases on the subject of compromises. The cases to be found in the books are different, and the doctrine derived from them cannot be applicable to the present case. The plaintiffs demand a total loss, and if they cannot recover for that, they are entitled to nothing. In *Berens* v. *Rucker*, and the other cases of compromise, which have been cited, the insurers were held liable to pay the charge of a compromise, *bona fide* made, to prevent condemnation, or to avoid a greater expense. The compromise was to save or regain possession of the property, not to abandon it to the captors. The insured, or the master, acted under the clause in the policy, which permits them to labour, &c. for the preservation of the property. This clause furnishes the true test of the master's authority; and while he acts for its preservation, a compromise made in good faith, for that purpose, is binding on the insurers; but where the compromise is made, not to save or recover the property, but for its loss, beyond the possibility of restoration, it cannot come within the scope of the authority given by that clause.

Prior to an abandonment, or a valid cause of abandonment, the master cannot, by his acts, turn a partial into a total loss, nor a total into a partial loss. Insurers are not answerable for the mistakes

or faults of the master, prior to an abandonment, nor for any errors of judgment.

ALBANY, Jan. 1812.

CLARKSON
v.
PHOENIX
INS. CO,

Then, whose agent was the master? If he was the agent of neither, then the insurers are not responsible for his acts; and admitting he was the joint agent of both parties, and acted beyond the scope of his authority, though *bona fide*, still the question recurs, and always must recur, are the insurers answerable ?

To ascertain the time when the master becomes the agent of the insurers, we must fix the time when the property was transferred to them. Until the property is actually transferred, or the insured have a right to transfer it, the property cannot be said to belong to the insurers, and the master cannot be their agent in respect to it.

Then, what is the true construction of the clause in the policy, which says, that the insured shall not abandon, in case of capture or detention, until after six months, or until after condemnation ? It is true that an abandonment relates back to the just cause of such abandonment; but it is begging the question, in this case, to say, that the capture was the just cause of abandonment. By this agreement of the parties, no right to abandon, in case of capture or detention, could exist, until after a condemnation, or a detention for six months. It is not capture alone that gives the right to abandon, but there must also be a condemnation or detention for six months. The contract in this clause is explicit, that the insurers are not to be answerable for a capture or detention which does not last six months, or is not followed by a condemnation. If the vessel is released before the end of six months, the capture or detention is a nullity. No technical total loss, and, consequently, no right of abandonment, can exist, until after a detention of six months, or a condemnation. Then, until the contingency happens which gives the right of action against the insurers, and fixes the rights of the parties, the master cannot be deemed the agent of the insurers, or of both parties, by necessity. But previous to such event, the master transferred the property to the captors. If the plaintiffs had done this, surely they could not claim for a total loss. The case of *Jumel & Desobry* v. *The Marine Insurance Company*, is not applicable to the present case.

This is not the case of a compromise, by way of *ransom*, like those which have been cited; it is an agreement, by way of sale or transfer of the property to the captors.

The property was, in fact, sold, and the capture and arrest

ALBANY,
Jan. 1812.

CLARKSON
v
PHOENIX
INS. CO.

* 6 *Johns.*
*Rep.* 226.

withdrawn and at an end, several months before the abandonment
was made.    There was a complete relinquishment of the subject;
an abandonment of the voyage.    The voyage was broken up, not
by reason of a peril insured against, as in the case of *Mills* v.
*Fletcher,* but by a sale of the subject.    When the abandonment
was, afterwards, made, the defendants had a right to say to the
plaintiffs, " the policy is at an end. The property has been sold by
the master, and the voyage abandoned."

If capture alone does not furnish a valid cause of abandonment,
then this case is not to be distinguished, in principle, from that of
*Craig* v. *The United Insurance Company.*\*    There is no differ-
ence between the abandonment of the property, for fear of a con-
demnation, and an abandonment of the voyage, for fear of cap-
ture.

Again, the master had no right to deprive the parties of any
claim, through the government, for a restoration of the property. It
is well known that many vessels captured under the *Berlin* and
*Milan* decrees have been restored.    By the compromise, all
ground for a claim to restoration has been taken away.    There
has been a complete relinquishment of the rights of the parties;
and the insurers were entitled to have the right to a chance of
restoration, transferred to them by the abandonment.

*Harison,* in reply.    When new cases arise, and the principles
of former decisions are applicable, the court will make the appli-
cation; and if new principles of decision must be resorted to, the
court will lay them down.    The *French* decrees are new and un-
precedented; and, by those decrees, this vessel and her cargo,
sailing lawfully and innocently, as a neutral, must have inevitably
been condemned, for having been visited by a *British* cruiser. The
prize courts of *France,* sitting and acting under those decrees,
were bound to condemn the property, and leave the injured party
to seek redress through his own government.    There would be the
same ground for a reclamation against the government, in this
case, as in every other, arising under the law of nations.

It was a matter of indifference to the master, whether the
*French* government or its citizens got the property, since the con-
demnation was certain.    He made the best use of circumstances to
compromise with the captors, and save a plank from the general
wreck.

The principle which is to govern in this case does not arise out
of the clause in the policy, giving the insured leave to labour for

the safety and preservation of the property. It arises from the power resulting to the master, from necessity, to act for the benefit of all concerned; and his acts, done *bona fide*, are binding on all. Does the right to ransom or compromise, after capture or abandonment, result from the general clause in the policy? In *Berens* v. *Rucker*, that clause is not alluded to. It is put on the broad ground of the necessity of the case, arising from the situation in which the property was placed.

The cases of ransom proceed on the same principle, and are perfectly analogous. A ransom may be made either by agreeing to pay a sum of money for the whole of the property, or that the captors should retain a part, and release the residue.

The written clause in the policy, as to an abandonment, merely suspends the exercise of the right, and leaves the parties, in every other respect, precisely in the same situation as if no such clause had been inserted. Can it be pretended that every thing which intervenes, during the six months, is to be at the risk of the insured? If within the six months the property is restored, so that the insured has the full and free use of it, then his right to abandon ceases; but if by the act of the master, or for any other cause, the property is not fully restored, then the act of abandonment has relation back to the time of capture. Suppose the property, after the capture, and before the expiration of six months, had been destroyed by an armed force, or had been redelivered on bonds; or suppose the master had paid three fourths of the property for liberty to proceed to *Tonningen*, would not the insurers in all these cases have been liable? There is no substantial difference between the present and either of the cases supposed.

In this point of view, it is unnecessary to enter into a very nice examination of the doctrine of agency. Whatever the master does after the accident, and before the insured have an opportunity to give him instructions, will not prejudice them.

Suppose the master to be the agent of neither party, then his act may be considered as *tortious* as the intermeddling of a stranger, for which the insured are not liable. The capture was a valid ground of abandonment, and the property remaining for six months after, without being restored, the abandonment has a full and complete effect.

Again, the plaintiffs have a just claim, at least, for an indemnity for a partial loss, or for three fourths of their property. Compromises have been allowed and sanctioned by courts; whether with good policy or not, it is unnecessary now to inquire.

This case is wholly different from that of *Craig* v. *The United Insurance Company.* Here was no idle or hasty fear of an inter-mediate capture. A capture had taken place, and there was, ac-cording to the judgment and belief of the best informed men, a moral certainty of condemnation; and if the compromise had not been made, it was equally certain that no part of the property would have been saved.

*Per Curiam.* The capture in this case created the total loss, and the special stipulation in the policy only suspended, for six months, the general right to abandon. At the expiration of the time, the abandonment was duly made, and it related back to the capture, and took its operation and effect from that loss. The only question is, whether the act of the captain, in the interme-diate time, destroyed or impaired the plaintiffs' right. During the interval of time between the notice of the capture and the abandonment, the property remained in the hands of the captors without restoration, and the captain, acting with good faith, and upon the best advice that could be obtained, entered into a com-position with the captors, and abandoned the property, upon pay-ment of 25 *per cent.* The parties to the policy neither authori-zed, nor have since adopted, the act of the captain; but as he was, *ex necessitate,* the mutual agent of both parties during that time, to do what was right, his acts, done in good faith, and for the benefit of all concerned, could not prejudice the rights of either under the contract. The doctrine laid down by Lord *Mansfield,* in *Mills* v. *Fletcher,* (*Doug.* 231.) was to this effect. The captain, in that case, had no authority but what was implied in his general trust as master of the vessel, and after a capture and recapture, and while the consequence of the capture rendered the case an extreme one, the master sold the vessel and cargo prior to an abandonment, and the court put the cause upon this point, whether the captain had acted with good faith and for the benefit of all concerned, and as there was no doubt of the fact, the assured recovered a total loss. This case is within the principle of that decision. There is every reason to believe that the composition in this case was prudent, and most for the interest of the parties to the policy; and there is no ground for a distinction between a composition by which the subject, or a portion of it, shall be specifically restored, or an equi-valent given for the subject itself. The question never turns upon the mode, or nature, or value of the composition, but upon the pru-dence or integrity of the act.

The abandonment being supported by the capture, and resting upon it, by relation, the benefit of the intermediate composition belongs to the defendants and not to the plaintiffs, and they must look for their proportion of it to the master. The plaintiffs are entitled to recover as for a total loss, to the extent of their interest insured.

<div align="right">ALBANY,<br>Jan. 1812.</div>

Judgment for the plaintiffs.