## RADCLIFF v. COSTER.

THE award of the commissioners under the treaty with France of 1821, has been held not conclusive, even where both parties appeared before them and litigated their claims.

The right to abandon depends on actual facts, existing at the time of the offer, not on the information then possessed. The offer to abandon must be founded on information of facts, sufficient to justify an abandonment. There must be both information of sufficient facts, and the existence of sufficient facts; although the facts need not be the same.

A restoration of a vessel prior to an abandonment, converts a total into a partial loss; but this rule does not apply, if the voyage be totally broken up, or the salvage exceed one half the value. The same rule applies to a restoration of cargo.

A party assured, having a right to abandon for a total loss, made his claim for such, and offered to abandon, which was contested. He entered with the assurers into an agreement to refer their claims to referees. The agreement did not assert that the

loss was total, but spoke only of the claim for a loss on ship, freight and cargo. The referees awarded a certain sum to be paid, and thereupon the policies to be cancelled. That sum was paid. A computation proved, that the liquidation must have been on the basis of a total loss.

*Held*, that the right to the indemnity under the French treaty, vested in the insurers, and that no assignment or cession was necessary.

*Mr. A. H. Dana*, for the complainants.

*Mr. J. L. Riker*, and *D. B. Ogden*, for the defendants.

THE ASSISTANT VICE-CHANCELLOR :—The bill in this cause is filed to recover the sum of $17,009, awarded by the commissioners under the treaty with France of 1831, to the defendants. They were insurers upon a cargo, owned by the complainant Roulet, and his deceased partner Mumford. The vessel was captured and carried into Amsterdam.

The case involves important questions, and has received an elaborate and able argument. Any error in my decision must spring from an inability to discern the truth, not from the omission of counsel to display it.

It has been argued upon two grounds: *First*, as to the conclusiveness of the award of the commissioners under the treaty between the United States and France. *Next*, as to the legality of the decision, supposing it not conclusive.

*First.* A mere outline of the facts will be sufficient to understand the first point. The complainant Roulet, and Gurdon S. Mumford, were owners of a vessel, on the cargo of which they effected an insurance with the Phœnix Insurance Company for $40,000, on a voyage to Tonningen. The vessel sailed in November, 1809. She was captured by a French privateer, sent into Amsterdam in January, 1810, and proceedings were taken to condemn her. Pending these proceedings, the supercargo made an arrangement to redeem vessel and cargo, upon allowing the captors two thirds of the sales of the cargo. This arrangement was subject to the decision of the tribunal of prizes, which

after a long delay was obtained. The vessel returned in April, 1810. A claim was made upon the underwriters for a total loss, which was contested. A submission was made to arbitrators, who awarded the sum of $21,672 to the assured, which was paid. Under the treaty of 1831, the commissioners allowed to the trustees of the Phœnix Insurance Company $17,009, on account of this claim. It does not appear on what ground the allowance was adjusted at that sum. If they took the invoice and charges which were $40,682, credited the one third of the sales $24,695 as of the 11th of June, 1812, and allowed interest on the balance to the time of payment on the 10th of June, 1813, the amount will be nearly what was allowed.

The complainant Roulet, and Letitia Mumford, former administratrix of G. S. Mumford, appeared by counsel before the commissioners, and presented their claims, asking an allowance for two thirds of the cargo. The commissioners awarded the whole sum to the trustees of the company, and hence must have passed upon the claim of the owners. They state in their report to the secretary of state, "that where insurers were claimants before the "board, their claims were generally allowed as valid for "the sums they had paid. The only exception to this rule, "was in cases of loss which had been especially adjusted "between the parties, by compromise or otherwise; and in "such case the object has been to carry into effect the in- "tention of the parties at the time of the adjustment."

It is insisted, on the part of the defendants, that this award of the commissioners is final. I consider the cases which have been cited do not leave me at liberty to enter upon this question.

The fact that the claimants had not appeared and contested their respective rights before the commissioners, was not considered a controlling circumstance in *Comegeys* v. *Vass*, (1 *Peters*, 212.) The decision, I must suppose, would have been the same, had the claim been presented by both parties. So, in the case before Chancellor Walworth, (*Varet* v. *The New-York Ins. Co.*,) it is to be inferred from the opinion, that both parties presented their

claims.  The chancellor says, that the commissioners, instead of allowing the whole to the representatives of the owners, allowed $5,000 of the amount to the defendants.  It is stated in the bill, that both parties presented their claims.

Upon the very important case of *Recarden* v. *Hill*, (2 *Sim. & St.* 434, and 2 *Russel*, 608,) it may be observed, that decided as was the opinion of the vice-chancellor, it was much qualified by that of Lord Eldon.  And again, by the 15th section of the act of parliament appointing commissioners, where a dispute arose between any parties interested in the claims, and the commissioners were not able to decide as to the persons legally entitled, a mode was provided, by which the fund was to be brought into the court of chancery, which was authorized to determine the right upon a summary application.  This plainly implies that parliament meant to confer the power of hearing adverse claims, and disposing of them, unless facts existed rendering a decision difficult or impossible.

There was another case before vice-chancellor Shadwell, under the same convention.  (*Lloyd* v. *Lord Kimberton*, 4 *Simons' Rep.* 296.)  The doctrine of the conclusiveness of the award was there reiterated.  The cases of trust or fraud were admitted to be exceptions.  In all other cases, the vice-chancellor thought it was intended that the award should be final.

But as I view the authority in our own court, (*Varet* v. *The N. Y. Ins. Co.*) to be decisive, I must proceed to inquire into the legality of the award.

It was before stated that the policy was $40,000.  It was a valued one.  There was no policy on the ship out, but one upon the freight at the Commercial Insurance Company, and two policies at the Phœnix Company, for the homeward voyage, one upon cargo ; the other upon the vessel.

The port of destination was Tonningen.  In January, 1810, the vessel was carried into Amsterdam.  The agreement made between the supercargo and the captors has been already mentioned.  The sanction of the council of prizes to which it was subject, was procured.

The precise time of that ratification does not appear, nor of the sale of the cargo. However, the latter may be taken as of the 11th of June, 1812, the date of the credit for one third of the proceeds in the account sales, rendered by W. & J. Willink, of Amsterdam. It was before that date, but how long before, is probably immaterial.

On the 14th of April, 1810, after information of the seizure and detention, a claim was made upon the Phœnix Company for a total loss, and an abandonment offered. The company refused to pay a total loss, conceiving itself as stated in the answer not liable for it.

It does not appear whether, at the time of the reception of the news of the capture and of the offer of abandonment, the assured knew of the agreement in Amsterdam, or whether indeed it had then been made. It is certain that the ratification was not obtained for a long time afterwards; but the agreement may have been made, and announced by the very conveyance which brought the tidings of the capture.

The bill alleges, that pending the proceedings the supercargo redeemed vessel and cargo upon the terms before stated, and that after the delay of two years, the approbation of the council having been obtained, the vessel was liberated in a very decayed state, and $18,964 expended to fit her for sea. The two years brings the liberation to about the month of January, 1812. It is not probable that repairs would be commenced until that event; and the vessel sailed after the 12th of June. Now in the absence of all proofs, I am warranted in concluding from the bill alone, that the agreement was made some time before the ratification; and the inference is also justifiable that such agreement was known here, at least some time before January, 1812. How long before is uncertain.

The vessel being liberated, returned with a homeward cargo, and arrived in September, 1812.

The rule is undisputed, that the right to abandon depends upon the actual state of facts existing at the time of the offer being made, not on the information possessed by the assured. (*Dickey* v. *The New- York Ins. Co.*, 4 *Cowen's*

*Rep.* 222. *Marshall* v. *Delaware Ins. Co.,* 4 *Cranch,* 202.)
Another rule is equally clear, that the offer to abandon
must be founded upon information of the occurrence of
facts sufficient to justify an abandonment. (*Bosley* v. *The
Chesapeake Ins. Co.,* 3 *Gill & Johns. Rep.* 450. See 3
*Mason,* 27. 4 *Pick.* 439.) Thus there must be both the
information of sufficient facts, and the existence of suffi-
cient facts ; although the facts need not be the same.

Upon the supposition that the agreement in Amsterdam
had not been actually made at the date of the offer, the
*right* to abandon was unquestionable. There was a total
breaking up of the voyage by a capture insured against.
(*Clarkson* v. *The Phœnix Ins. Co.,* 9 *Johnson,* 1.) *Next,*
upon the supposition that the agreement had been made,
the abandonment was also warranted. It was a condi-
tional agreement, subject to the ratification of the court of
prizes. No restoration had been made ; and if ratified, the
voyage must effectually be broken up.

*Lastly,* supposing that the agreement had then been
ratified by the tribunal of prizes, in my opinion the right
was the same. More than one half of the cargo was
wholly lost ; two thirds being allowed to the captors.
This as a general rule justifies an abandonment for a total
loss. (*Centre* v. *The American Ins. Co.,* 7 *Cowen,* 564.)
Vessel, cargo and freight, stand upon the same ground as
to a technical total loss by reason of a damage to that ex-
tent. (*Ibid.*) *Again,* there was to be an absolute break-
ing up of the voyage, as the cargo was to be sold at Am-
sterdam. There was no restoration of more than one half
of the cargo. A restoration of a vessel prior to an aban-
donment converts a total into a partial loss ; but this rule
does not apply if the voyage be totally broken up, or the
salvage exceed one half of the value. (*Dickey* v. *N. Y.
Ins. Co.,* 4 *Cowen,* 246.) The same rule must apply to a
restoration of cargo. In *Marshall* v. *The Delaware Ins.
Co.,* (4 *Cranch,* 202,) Chief Justice Marshall said this point
came under the consideration of the court in the case of
*Rhinelander* v. *The Insurance Company of Pennsyl-
vania,* in which case it was said, that where a belligerent

has taken full possession of a vessel or prize, and continues that possession to the time of abandonment, there exists in point of law a total loss. The court, in delivering this opinion, understood itself to require, that the continuance of the possession up to the time of abandonment, or a technical total loss incurred notwithstanding the restoration, was necessary to justify a recovery as for a total loss.

There is, however, one circumstance which creates a doubt upon this part of the case.

It will be borne in mind that I am viewing the case on the supposition that the agreement had been ratified at the date of the abandonment. The agreement was made by the supercargo, *prima facie* the agent of the assured. The sales in pursuance of it took place afterwards. For whom was he then acting in the contemplation of law ?

The case of *Clarkson* v. *The Phœnix Ins. Co.*, (9 *Johns.* 1,) is decisive upon this point, and would clearly establish the right to abandon for a total loss, but for one particular. Whether that is sufficient to distinguish it, is to be inquired into. In that case there was a capture and an abandonment, which, however, under the terms of the policy was not made until six months after the notice. Between the time of giving the notice and the abandonment, the master compromised with the captors, giving up the property upon receiving 25 per cent. It was held that the abandonment related back to the time of the notice, and being then justifiable, the act of the captain, the agent from necessity, being done in good faith, and for the benefit of all concerned, could not prejudice the claim for a total loss. It must be noticed that the parties to the policy neither authorized, nor afterwards adopted, the act of the captain. (See also *Craigs* v. *Church*, stated in note to *Waddle* v. *Columbian Ins. Co.*, 10 *Johns.* 65, 2d ed.)

But in the present case the assured, upon the return of the vessel in September, 1812, received a part of the one third of the proceeds of the outward cargo in an investment in the homeward cargo. Still it is obvious that until this time the right to abandon existed unimpaired. There was no adoption of the act of the supercargo, as done on

their behalf until that period. · Even their approval does not appear, though certainly to be presumed. But an approval is very different from the assumption of the act as made on their account. And it seems to me clear that this reception of a portion of the proceeds is not so controlling a fact, as of itself to convert a total to a partial loss; that the conduct of the parties must still be examined to ascertain whether they meant it to effect such a conversion. Beyond a doubt the assured could still have adhered to the previous abandonment; could have made a new one; and held themselves merely as trustees of the funds in question for the use of the underwriters. The case of *Walden* v. *The Phœnix Ins. Co.*, (5 *Johns*. 310,) appears decisive on this point.

I view, therefore, these points to be clear—that the right to have abandoned for a total loss is undeniable, either upon the hypothesis that no agreement had been entered into when the offer was made; or that such agreement had been entered into but not ratified at Paris; or that it had been fully sanctioned. And further, that the transmission of part of the one third of the proceeds by the house in Amsterdam, and the reception of it by the assured here, did not of itself annul the right to abandon, or revoke an offer to abandon previously made.

Then as to facts tending to show that the assured continued to insist upon a total loss. It appears, that on the 29th of April, 1813, an agreement was entered into between the assured and the Phœnix and Commercial Insurance Companies, to submit the claims to Richard Harison, Caleb S. Riggs, and David B. Ogden.

The material terms of that submission are these : After reciting the policies it proceeds, " and whereas the said " assured claim to have sustained loss on the said ship, " freight and cargo, for which the said insurers are said to " be liable, and differences existing between the parties re-" lating thereto : Now, therefore, we the parties assurers " and assured, do hereby respectively agree each with the " other, to submit all claims and demands, disputes and " differences upon and concerning the said policies of in-

1839.

Radcliff
*v.*
Coster.

" surance to the arbitration and determination of, &c.,
" whose award shall be final and conclusive."

It is obvious that this submission is broad enough to cover a claim for a total loss.

The award of the arbitrators was made on the 7th of June, 1813. After reciting the submission, they awarded and ordered, that the Phœnix Insurance Company of New-York, should pay unto the said J. S. Roulet and Gurdon S. Mumford, $21,674 34, in full of all demands by reason of the matters in the said submission specified, and that the policies of insurance specified in the agreement should be given up to be cancelled, which being done, all matters in controversy should cease.

I consider it nearly a demonstration that the arbitrators settled the amount upon the principle of a total loss.

*First*, an adjustment upon the basis of a partial loss would have led to a widely different result. *Next*, a liquidation upon that of total one, makes the result almost identically the same.

The mode of adjusting such a loss, if partial, was settled in the case of *Suydam* v. *The Marine Ins. Co.*, (2 *Johns. Rep.* 138.) The rule was adopted, (in conformity with that in *Mitchell* v. *Edil*, 1 *T. R.* 608,) that from the invoice price was to be deducted the proceeds of the property preserved, and sold at the port of detention. The statement No. 1, submitted in the case, was taken as correct ; (see p. 138 ;) by which the invoice price was taken, the nett proceeds deducted, and interest allowed on the balance from the 3d of May, 1802, which (as appears by the report in 1 *Johns. Rep.* 181,) was the day of the abandonment.

This case was determined in 1802, and Mr. Riggs, one of the arbitrators, was of counsel in it.

The present case is not liable to the criticism of Mr. Phillips, (*On Insurance*, p. 380,) upon that of *Suydam* v. *The Ins. Company.* There the sale was compelled upon the terms of receiving payment to a great extent in goods. The true value of the goods taken may have been very different from the cash proceeds of the original goods.

Here there was a cash sale, and it is to be assumed, at the fair market price.

I must consider that there could have been no other rule on which these arbitrators would have stated a partial loss. The invoice price, without expenses, was $39,640 67; with them $40,682 86. Deduct the avails of the goods $24,695 32, and the balance would be $14,945 35 or $15,987 54, with interest from the 14th of April, 1810, say three years. In no mode could it exceed $19,341.

*But next,* a computation upon the ground of a total loss makes the amount nearly the same as the sum awarded.

The invoice account, as before observed, was $39,640 67. The expenses added made the whole $40,682 86. But no more could be allowed than the face of the policy, say

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| therefore | - | - | - | - | 40,000 00 |

The insurers having three months to pay, the interest will be from 14th July, 1810, to 7th June, 1813. (2 years, 10 months, 24 days.) - - - - 8,119 99

48,119 99

| | | |
|---|---|---|
| Proceeds of sales, one third, | $24,695 32 | |
| Interest from 11th June, 1812, to 7th June, 1813, (11 months, 27 days,) | 1,714 20 | 26,409 55 |

The award was $21,672 34. Diff. $38 10.  21,710 44

It appears by the receipt of the assured, annexed to the bill, that the amount was paid in cash and their notes. The notes were three in number, one for the premium on the outward cargo, for the loss of which the assurers were then paying; the others for premium on the homeward cargo and the ship, both of which had been fully earned. The debts were clearly due; and the cancelment of the notes was equivalent to payment in cash.

I consider, therefore, that this case is made out. A claim for a total loss made upon sufficient grounds, and an offer to abandon; a refusal to accept the offer,—the continuance of the right to abandon down to the submission;

no revocation of the offer, and no renunciation or varying of the claim; a submission, in terms sufficient to comprise the demand, whether the loss was total or partial; a decision and award, which could have proceeded upon no other foundation than that of a total loss; and full payment by the assurers, and reception by the assured, of the amount so awarded. I cannot see a reasonable ground on which to distinguish such a case from one of acceptance and payment, or of payment after judgment of law.

An acceptance is not requisite to give validity to an abandonment. The right of the assured here, to charge for a total loss, was not in the least affected by the refusal of the company. The right to recover was perfected, and the right to the property vested in the assurers, without an acceptance.

It is true, a revocation of the abandonment would have varied the case. In general, a revocation can only be made with the assent of both parties. (*Ring* v. *Middleton*, 1 *Con. Rep.* 202.) But that must be where the agreement has been consummated by acceptance. The assured, in this instance, could have revoked without any such assent, in consequence of the refusal of the assurers.

It is, however, said, that an assignment is requisite to vest a title to property insured. Clearly, if the abandonment had been accepted, and a total loss paid for, it would not have been necessary. (*Chesapeake Ins. Co.* v. *Stark,* 6 *Cranch,* 272. *Comegeys* v. *Vasse,* 1 *Peters,* 213.) The view I have taken, proceeds on the supposition that what has been done, was equivalent to acceptance and payment.

Upon the remaining question, whether the right to this fund could pass at all, or at least without a formal cession, I cannot harbor a doubt. The principle, that the insurer after payment was entitled to all eventual benefits which the ownership of the property could confer, was declared by Lord Hardwicke to be the plainest of equities.

In the year 1811, with a sagacity which amounted almost to the prescience of a seer, Chief Justice Kent imaged forth this very case, and gave the rule for its decision.

1839.

Radcliff
v.
Coster.

" To attempt," he says, " to ascertain the value of the *spes*
" *recuperandi*, as it respects the claim on the French gov-
" ernment, and to deduct that value from the recovery, ap-
" pears to me useless.   There is no possible rule for com-
" putation.   If that hope does legally exist, so that it can be
" judicially regarded, the plaintiff ought to renounce it in
" favor of the insurer, or not recover it at all.   But there is
" no existing hope of recovery in this case.   If France
" should at any future period agree to, and actually make
" compensation for the capture in question, the government
" of the United States, to whom the compensation would, in
" the first instance, be payable, would become a trustee for
" the party having the equitable title to the reimbursement,
" and this would clearly be the defendants, if they should
" pay the amount of the bond.   There would be no doubt
" of their claim in equity."  ·

The case of *Comegeys* v. *Vasse*, also determines the
point expressly, that a claim of this character passes by
an abandonment; and both the Chancellor and Justice
Cowen support the same position. (*Hosack* v. *Rogers*,
6 *Paige*, 415.  18 *Wendell*, 319.)  Indeed, the latter holds
that payment is not necessary.

It remains to consider the decision of the Chancellor in
*Vaset* v. *The New- York Ins. Co.*  It is sufficient to say,
that in that case, after an abandonment and refusal, a
compromise was effected, by which the sum of $5,000 was
paid to the assured, which was less than one third of the
amount to which they would have been entitled upon the
abandonment of the *spes recuperandi*.  In the present
case my conclusion is, that the whole amount was paid
which would have justified a demand for a cession of the
*spes recuperandi*, and that such a cession was needless.

The cause has been much argued, upon the mere pecu-
niary equities of the parties.  No question, on this score,
can exist.  The assured received principal and interest
upon their investment.  They lost nothing in actual
amount, although deprived of the profits of their voyage.
The assurers paid over twenty-one thousand dollars, and
have received nothing.  The assured received also the

amount insured upon the freight, and $15,000 for injury to the ship, being within three thousand dollars of their expenses. I should not have adverted to this consideration, but for the importance given to it on the argument. It is, however, satisfactory, that the conclusion reached upon strict principles of law, comports with a plain dictate of natural justice.

The bill must be dismissed, and with costs as against the plaintiff Roulet, and without costs as to the plaintiff Radcliff. (*Goodwich* v. *Pendleton,* 3 *Johns. C. R.* 520. *Mauny* v. *Phillips,* 1 *Paige,* 472. *Sharply* v. *Sharply,* 13 *Price,* 765.)